# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-1526V
UNPUBLISHED

| | |
|---|---|
| SARAH VOELLER, *as parent and natural guardian, on behalf of N.V., a minor*,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: July 6, 2023<br><br>Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Influenza (Flu) Vaccine; Guillain-Barré Syndrome (GBS) |

*David John Carney*, Green & Schafle LLC, Philadelphia, PA, *for Petitioner.*

*Claudia Barnes Gangi*, U.S. Department of Justice, Washington, DC, *for Respondent.*

### DECISION AWARDING DAMAGES[1]

On November 4, 2020, Sarah Voeller filed a petition on behalf of her minor child, N.V., for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that that N.V. suffered from Guillain-Barré syndrome ("GBS") as a result of an influenza ("flu") vaccine she received on January 23, 2018. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters, and although Respondent conceded entitlement, the parties were not able to settle damages.

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount of **$185,000, reflecting past pain and suffering.**

## I.     Relevant Procedural History

Within seven months of the case's initiation, Respondent filed a Rule 4(c) Report conceding entitlement. ECF No. 17. A Ruling on Entitlement was thus issued on June 16, 2021. ECF No. 22. The parties thereafter attempted to resolve the issue of damages, but informed me in February 2022 that they could not. ECF No. 27. Petitioner thus filed a Motion for Ruling on the Record for Petitioner's Damages ("Mot.") on April 25, 2022. ECF No. 29. Respondent's reaction ("Resp.") was filed on August 12, 2022, after a delay to allow Petitioner to obtain N.V.'s most recent treatment records. ECF No. 36. Petitioner filed a reply ("Repl.") on September 2, 2022. ECF No. 37. The matter is now ripe for resolution.

Petitioner argues that an award of $190,000 in past pain and suffering, plus an annuity to fund future medical expenses proposed by Petitioner's life care planner, is appropriate. Mot. at 1; Repl. at 1. Petitioner highlights the long duration of N.V.'s GBS symptoms, including ongoing pain, fatigue, and sleep and behavioral issues. *Id.* at 26. Petitioner argues that N.V.'s young age at the time of her GBS injury has "largely impacted" her life, and that she will "suffer from this condition and the effects it has had on her for the rest of her life." *Id*. Petitioner's life care planner has proposed treatment for the duration of N.V.'s life, including neurology follow-ups, periodic physical therapy evaluations, massage and chiropractic therapy, psychological counseling, membership at an athletic club, and several items of medical and assistive equipment. *Id*. at 31-32.

Respondent, in contrast, proposes that the lesser award of $88,000.00 in pain and suffering is appropriate because of "N.V.'s limited hospital stays, conservative treatment, relatively short inpatient rehabilitation stay, brief course of PT, her recorded successful recovery from GBS four months post-vaccination, and resolution of her GBS symptoms other than variable feelings of 'achy and heavy' legs and sensitivity issues." Resp. at 12. Respondent also opposes an award of an annuity for Petitioner's future care because while Respondent's life care planner found some items reasonable and necessary for N.V. in the future, all such care would be covered by Petitioner's insurance. *Id*. at 16-17.

## II.    Relevant Medical History

N.V. was four years old when she received flu and varicella vaccines at her pediatrician's office in St. Louis Park, Minnesota on January 23, 2018. Ex. 1 at 5. Petitioner recalled that N.V. began to complain of pain in her legs on March 2, 2018 (38 days after vaccination). Ex. 2 at ¶10. The following morning, N.V. was unable to get out

of bed on her own and had trouble walking, complaining of pain in her hips and thighs. *Id*. at ¶11.

On March 5, 2018, Petitioner brought N.V. to the emergency room. Ex. 3 at 30-31. An ultrasound of N.V.'s hips was normal and an x-ray revealed only constipation. *Id*. at 30. Her pain was treated with Toradol. *Id.* Doctors considered several potential diagnoses, including GBS. *Id*. at 31. At this time, N.V. refused to lay on her back, experienced severe pain while in a sitting position, and woke every couple of hours due to pain and itching. Ex. 2 at ¶12. N.V. presented to her pediatrician the following day, March 6, 2018. Ex. 12 at 48-49. She was diagnosed with transient synovitis and advised to use over-the-counter medications for pain. *Id*. at 50.

N.V.'s symptoms persisted and worsened, such that she refused to sit on the toilet due to pain. Ex. 2 at ¶ 13. N.V. was admitted to the hospital on March 9, 2018 for further evaluation. Ex. 3 at 5. She continued to have difficulty walking and complained of thigh pain. *Id.* N.V. underwent extensive testing, including blood tests, and MRIs of her pelvis and lumbosacral spine. *Id*. at 5-11. Many of the tests were significantly distressing for such a young child, particularly those that required her to fast from food and drink. Ex. 2 at ¶16-17. She was discharged on March 11, 2018 (after three days) with only a diagnosis of constipation. *Id.* at 6.

On March 14, 2018, Petitioner took N.V. to the emergency room at another hospital because she had developed areflexia and persistent limb pain that had progressed to her upper extremities. Ex 4 at 14. In addition to her limb pain, N.V. reported "pain out of proportion to touch" and a few falls while walking. *Id.* She underwent further testing, including a lumbar puncture and nerve conduction study, both of which were consistent with GBS. *Id*. at 23. She was treated with two IVIG infusions and discharged on March 21, 2018 (after seven days) to inpatient rehab. *Id.*

N.V. remained in inpatient rehab until April 6, 2018, when she was discharged home. Ex. 5 at 9. She received physical and occupational therapy, therapeutic recreation, and rehab psychology services. *Id.* at 10. Upon discharge, N.V. could walk unassisted, including up and down stairs, and had significantly reduced pain. *Id*. Her remaining pain was "well controlled with naproxen" and she had discontinued gabapentin. *Id*. She continued with outpatient physical therapy from April 9, 2018 through May 16, 2018, completing seven sessions. Ex. 6 at 4. Upon discharge from physical therapy, N.V. had returned to running and jumping, and to her full-time daycare. *Id*. at 5. She continued to report some increased fatigue but could make it through her regular day without problem. *Id*.

3

On April 13, 2018 (three months after vaccination), at a follow up with her pediatrician, Petitioner reported that N.V. had improved since her discharge, including better sleep and only occasional reports of pain (which Petitioner was unsure was true pain versus frustration). Ex. 12 at 55. On exam, N.V. had "dramatic improvement" and was able to run "with a slightly wide-based gait and exaggerated sway of the hips." *Id.* at 56. Petitioner was instructed to follow up for N.V.'s five-year well-check or as needed. *Id*.

On May 29, 2018 (now four months after vaccination), N.V. had a neurology follow-up appointment with Dr. Hyoung Won Choi. Ex. 4 at 7-9. On exam, N.V. appeared to have regained full strength. *Id.* at 7. Dr. Choi thus opined that N.V. had "successfully recovered from" her GBS, with some "residual emotional/physical effect following her long hospitalization," which he expected to "gradually improve over time." *Id.*

There are no subsequent medical records for the next almost seven months, when N.V. returned to her pediatrician on December 14, 2018, for a consultation prior to international travel. Ex. 12 at 58. Petitioner now reported that N.V. was experiencing "no recurrent neurological symptoms." *Id.* On March 19, 2019 (14 months after vaccination), N.V. returned to Dr. Choi for a neurology examination. Ex. 4 at 5. Petitioner reported that N.V. complained of leg pain when she was tired, and that her feet felt like "bees." *Id.* Her neurological exam was normal, however, with full strength and normal reflexes. *Id*. Dr. Choi discharged N.V. from his care and referred Petitioner to an infectious disease specialist to discuss future vaccinations for N.V. *Id*.

On April 10, 2019, Petitioner presented to infectious disease specialist, Dr. Laura Norton. Ex. 16 at 8. N.V. displayed no residual neurological deficits at this time, and Petitioner was encouraged to obtain additional vaccinations for N.V. *Id.* at 8, 9. Petitioner consulted an immunologist on July 16, 2020, reporting that N.V.'s "only lingering issue . . . is that she may get tired quicker with activities." Ex. 7 at 5.

More than a year later, on November 27, 2020, N.V. returned to her pediatrician with complaints of itching. Ex. 17 at 21. Petitioner reported that N.V. (now age six) "always liked to be scratched" "to help her relax or fall asleep." *Id.* She returned on February 23, 2021 (more than two years after her vaccination) for her seven-year-old well-check. *Id*. at 24. Petitioner reported that N.V. complains of tired legs in the morning and at bedtime and asked to be carried and that N.V. "always wants to be scratched." *Id*. N.V.'s exam was normal. *Id.* at 27.

On February 1, 2022, N.V. presented to her pediatrician for her eight-year-old well-check (four years after vaccination). Ex. 21 at 26. Petitioner again reported that N.V. complained of leg pain when very tired and liked to be scratched. *Id*. at 27. She reported that N.V. "seemed to keep up with peers, but needs a longer time to recover after physical

activity" and was very sensitive to hair brushing. *Id*. Dr. Holland referred N.V. to physical medicine and rehab specialists for further evaluation of her ongoing leg pain and fatigue following her recovery from GBS. *Id*. at 28. Dr. Holland opined in a letter on March 2, 2022, that she believes N.V.'s continued reports of "wobbly legs" and fatigue are directly related to her GBS diagnosis. Ex. 19 at 1. She noted that while it is difficult to know what Nora may need in the future, "there is potential that she may benefit from regular physical therapy, long-term support from a physical medicine and rehab specialist or neurologist, mental health support, and access to physical exercise. *Id.*

On June 20, 2022, N.V. was evaluated by Dr. Andrea Paulson, a physical medicine and rehab specialist. Ex. 22 at 6. N.V. reported occasional pain in her legs and a "heavy, achy feeling." *Id*. Petitioner reported that N.V. "is keeping up with peers" and that there was no tripping or falling, and that N.V. "needs her whole body scratched/rubbed down from a sensory perspective" and feels itchy at night. *Id*. Dr. Paulson noted that N.V. "had complete recovery of motor function and reflexes and has been back to baseline function," but that N.V. appeared to have some nerve irritability. *Id*. at 8. N.V. was referred to occupational therapy to work on "sensory input options including desensitization" and referred for custom orthotics "to help with good foot placement." *Id*. Dr. Paulson also discussed possible physical therapy for endurance, pain psychology, and possible use of gabapentin in the future. *Id*.

On October 14, 2022, N.V. underwent an occupational therapy evaluation. Ex. 23 at 4. N.V. complained of restlessness in her legs when she is fatigued, mostly at bedtime. *Id*. at 6. The therapist noted that "these concerns . . . are not impeding to the point where cannot function in daily living tasks." *Id*. at 7. Ongoing occupational therapy was not recommended. *Id.*

There are no further records of treatment. Petitioner states that N.V. continues to "experience fatigue more frequently and faster than other children her age" and still benefits from a daily nap (which is unusual for children hear age). Ex. 2 at ¶32. N.V. continues to experience increased emotional reactions, including anxiety about medical appointments. *Id.*

### III.   Parties' Life Care Plans

#### A. Petitioner's Life Care Plan – Roberta Hurley

On September 24, 2021, Roberta Hurley provided a Summary and Needs Assessment for N.V. Ex. 18. She also provided a supplemental report, on April 21, 2022, in the form of a response to Respondent's life care plan. Ex. 20.

5

Ms. Hurley noted that, at the time of her initial assessment, N.V. "says her feet feel like bees are stinging her," complains of leg and hip pain, and headaches, and requires more sleep than most children. Ex. 18 at 2. She acknowledged that N.V. swims and rides horses "on a regular basis," but nevertheless tires "faster than her peers." *Id*. N.V. was not on any medications at the time and was not receiving any specialist medical care. *Id.*

Ms. Hurley states that N.V. is currently covered by medical insurance, and will continue to have that coverage through age 26. *Id*. She acknowledged that "it is more than likely that N.V. will be able to secure a full-time job with benefits, but [that she would] put in some safeguards for her medical issues in the event her GBS flares up." *Id*. She included the full costs of her recommended items because "a full medical insurance plan is not warranted when [N.V.] is 26, 2040." *Id.*

Ms. Hurley recommends that N.V. have periodic evaluations with neurology and physical therapy, as well as regular massage, chiropractic, and psychological therapy. Ex. 18 at 3-4. She also recommends that N.V. obtain a membership to a health club with a pool and have various medical and assistive devices, including, but not limited to compression socks, heating pads, walker, and electric wheelchair. *Id*. at 4.

Ms. Hurley's supplemental report provides a direct response to the life care plan of Respondent's expert, Laura Fox. *See* Ex. 20. Ms. Hurley opines that Ms. Fox did not allow Ms. Hurley or N.V.'s parents to ask questions during her interview, and focused her questioning on topics that "were not relevant." *Id*. at 1. She states that Ms. Fox's interview "did not address any of N.V.'s needs regarding pain and the inability to perform tasks for a child her age...." *Id.* Ms. Hurley reiterated her belief that the services in her life care plan were necessary for N.V. in the future. *Id*. at 2.

### B. Respondent's Life Care Plan – Laura Fox

In January 2022, Laura Fox provided a Nursing Assessment and Life Care Plan for N.V. on behalf of Respondent. ECF No. 36, Ex. A-B.

Ms. Fox began by noting that at the time of her assessment, N.V. ambulated without restrictions and was not on any medications, but did complain of hip and leg pain and was easily tired and frustrated. Ex. 36, Resp. Ex. A at 1. She observed N.V. run, hop and play catch with her father. *Id.* at 3. She noted that N.V.'s parents described that she is "often very labile in her emotions" at home, but has "no behavioral concerns at school." *Id*. N.V.'s parents also described her "extreme anxiety over medical appointments and injections." *Id.*

Ms. Fox's life care plan recommended that N.V. have psychological counseling (12 sessions at age 16, 18, and 21) and an annual follow-up with her pain management and rehab specialist, as well as custom orthotics. *Id*. at 1-3. Ms. Fox did not recommend the remaining items recommended by Ms. Hurley in her life care plan, however. *Id*. For the

items recommended, Ms. Fox opined that they would be covered, in their entirety, by N.V.'s existing health insurance. *Id.*

## IV. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with that of my predecessor Chief Special Masters) adjudicating similar claims.[3] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress

---

[3] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). In *Graves,* the Court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 589-90. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 593-95. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it offers a reasoned understanding of the issues involved in pain and suffering calculations.

### V. Appropriate Compensation for Petitioner's Pain and Suffering

Although neither party disputes N.V.'s awareness of her injury, analysis is complicated by her young age at the time of her GBS injury. In determining whether a Petitioner was aware of her pain and suffering, the question is whether there were any impediments that may have prevented her from perceiving the injury. *Wright v. Sec'y of Health & Human Servs.*, No. 16-0498V, 2020 WL 6281782, at *15 (Fed. Cl. Spec. Mstr. Sept. 25, 2020). "Thus, when an infant or young child is injured, it is reasonable to consider whether the child's age and limited cognitive abilities would have impaired their awareness of the injury." *Id*. Here, there is no evidence in the record that N.V. suffered from any condition that would impact her ability to perceive the physical pain and suffering from her GBS and/or the medical treatment she received. Therefore, I find that N.V., even at age four, was aware of her injury and treatment at all relevant times.

When performing analysis of the duration and severity of the injury, I review the record as a whole, including the medical records and affidavits filed, and all assertions made by the parties in written documents. N.V.'s medical records and Petitioner's affidavits describe the course of her GBS. N.V.'s path to diagnosis was difficult, with three visits to the hospital and extensive testing before she was diagnosed with GBS and began treatment. *See* Ex. 3 at 7-31; Ex. 4 at 14-69. N.V. was hospitalized for ten days hospitalization, had numerous MRIs, an EMG/NCS, and a lumbar puncture, and received two IVIG infusions. *Id*. Petitioner described the impact of the various tests and treatment on N.V. during this time. *See* Ex. 2 (N.V. had to be held down for blood draws and IVs, had to fast from food and drink for long periods of time for medical tests, and had multiple

sedations.).

After her diagnosis, however, N.V. had a moderate in duration treatment course and a good recovery, which included a 16-day stay in inpatient rehab. *See* Ex. 5. Upon discharge, N.V. was able to walk with minimal assistance, could go up and down stairs with a railing, and only occasionally complained of pain. *Id.* at 8-12. She had seven sessions of outpatient physical therapy and was discharged having met all of her therapy goals. Ex. 6 at 4-6. At that time (four months post-vaccination) she had returned to full-time daycare, had returned to running and jumping, and could "typically make it through the day without issue." *Id.* at 5. Petitioner did not seek care for N.V. again until eleven months after her vaccination, when she visited her pediatrician before an international trip (and not for specific concerns related to N.V.'s GBS). Ex. 12 at 58. N.V.'s neurological exam from this time period was normal, with "no recurrent neurological symptoms." *Id.*

By 14 months post-vaccination, N.V.'s neurologist also noted that she had a normal neurological exam, had full strength and reflexes and discharged her from further care. Ex. 4 at 5. For the next three years through 2022, N.V. returned to her pediatrician for regular, annual wellness exams. Ex. 17 at 21, 26, 27. Petitioner reported that N.V. continued to experience mild symptoms, including fatiguing more easily than her peers, experiencing pain in her hips and legs when tired, and liking to have her skin scratched. *Id*. Most recently, in mid-to-late 2022, N.V. was evaluated for some residual sensory issues but was not found to need substantial ongoing care. Ex. 22 at 6; Ex. 23 at 4-7. Although there is follow-up care and mild sequela, which is common in GBS cases, N.V. was substantially recovered from her GBS by four months after her vaccination.

Both parties rely on prior GBS cases involving adult petitioners, as they accurately note that there are no available decisions involving petitioners as young as N.V. to consider with respect to damages. Petitioner relies primarily on *Dillenbeck v. Secretary of Health & Human Services.*, No. 17-0428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019), and *Devlin v. Secretary of Health & Human Services.*, No. 19-0191V, 2020 WL 5512505 (Fed. Cl. Spec. Mstr. Aug. 7, 2020) to support her requested pain and suffering award. The petitioner in *Dillenbeck* received $170,000 in past pain and suffering (along with a future award) for a treatment course including a 14-day hospitalization, 5 days inpatient rehab, multiple rounds of IVIG treatment, and one month of outpatient physical therapy. *Dillenbeck*, 2019 WL 4072069 at *1-2, 14. In addition, Ms. Dillenbeck suffered from ongoing sequela, including paresthesias in her hands and feet and an unsteady gait, which prevented her from continuing to work in her preferred profession as a veterinary technician. *Id*. at *2, 10-11. The petitioner in *Devlin* was awarded $180,000 in past pain and suffering for GBS treatment course involving 12-days in the hospital, seven plasmapheresis treatments, and 12 sessions of out-patient physical therapy. *Devlin,* 2020 WL 5512505 at *3. His last treatment occurred about 18 months after his

vaccination and he enjoyed a good recovery, with some "residual symptoms that are common GBS sequelae." *Id*. Petitioner argues that N.V. received similar treatments as Ms. Dillenbeck, but had a more severe initial presentation and a longer (more than four year) period of ongoing sequela. Mot. at 23. Petitioner further argues that N.V. suffered longer than Mr. Devlin and that her sequela has not improved over time. *Id*.

Respondent relies on *Sand v. Secretary of Health & Human Services*, 19-1104V, 2021 WL 4704665 (Fed. Cl. Spec. Mstr. Aug. 31, 2021) in support of his proposed award. That petitioner was awarded $130,000 in past pain and suffering for his GBS injury. *Id*. at *1. Mr. Sand was not diagnosed with GBS for approximately five months after his vaccination, during which he underwent several MRIs and an EMG/NCV study, which precluded him from treatment with IVIG. *Id*. at *6. He treated his GBS symptoms, primarily back pain and upper body weakness, with gabapentin. *Id*. at *2-3. Mr. Sand continued to suffer from ongoing sequela, including numbness in his fingertips and feet and decreased stamina. *Id*. at *3. Respondent argues that N.V.'s case was less severe than the *Sand* petitioner because Mr. Sand reported higher levels of initial pain and experienced anxiety while awaiting diagnosis, and experienced slow and gradual improvement, rather than the quicker improvement of N.V. Resp. at 15. Respondent also acknowledges that he used cases settled by proffer, without explaining his specific reasoning, to arrive at his lower proposed award for N.V. *Id*. at 15-16.

Given N.V.'s treatment course, I find Respondent's recommendation of $88,000 is far too low, and fails to properly recognize N.V.'s experience with her initial symptoms, diagnosis, hospitalizations, and treatment course. In addition, Respondent's proposed comparable – *Sand* – is distinguishable. That petitioner was not hospitalized, did not undergo a lumbar puncture, did not receive any IVIG treatment, did not receive any rehab or physical therapy treatment – and *still* received a higher award than what Respondent proposes. I have noted in prior decisions that GBS constitutes a particularly alarming kind of vaccine injury – and that as a result, pain and suffering awards in this context should be a bit higher than average, to account for the frightening nature of the condition. *Gross v. Sec'y of Health & Human Servs.*, No. 19-0835V, 2021 WL 2666685 at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2021). Respondent has not provided proper justification for why N.V.'s experience with GBS was substantially below that of Mr. Sand.

N.V.'s medical records reveal a clinical course more similar to the *Dillenbeck* and *Devlin* petitioners. She was hospitalized a total of ten days (three days initially when seeking diagnosis and then seven days once GBS was diagnosed), received IVIG treatment and pain medications, spent 16 days in inpatient rehab, and had seven sessions of outpatient physical therapy. N.V. endured a more difficult path to diagnosis, with one ER visit and two hospitalizations, along with several medical tests (made more difficult due to her young age), to arrive at her GBS diagnosis. Although N.V. has suffered from some relatively mild ongoing sequela, her neurological exams have been normal,

with full strength and reflexes since 14 months after her vaccination, and she attends school and activities without restrictions. She also suffers from common ongoing sequela, such as fatigue and occasional pain or sensory changes, but there is no evidence that the sequela have had a significant impact on her life. N.V. attends a regular school without restrictions, and participates in activities, including horseback riding and swimming on a regular basis. *See* Ex. 18. N.V. currently has no mobility issues, and no "physical or social limitations." *Id*. at 4; Ex. 19 at 1. Petitioner described N.V.'s ongoing sequela as "manageable, but notable." Ex. 17 at 27. On balance, N.V.'s pain and suffering award should be in the same range at *Dillenbeck* and *Devlin*.

Petitioner also argues that N.V.'s GBS injury justifies a higher pain and suffering award because of her young age and the impact of her injury on her childhood experience, as well as the impact of the injury on her future. Mot. at 23-25. While N.V.'s clinical course is similar to that of the adult petitioners in *Dillenbeck* and *Devlin*, Petitioner has provided persuasive evidence that N.V.'s suffering, at least in the early stages of her diagnosis, might have been more significant than for an adult. In her affidavit, Petitioner described the impact of the hospitalization and treatment on N.V., who was four years old at the time. *See* Ex. 2. N.V. had to be held down for IV's and blood draws (which is far less likely for an adult patient), struggled being woken throughout the night in the hospital for tests and treatment, became frustrated and fearful of the many medical staff who treated her, and endured several periods of fasting from food and drink to accomplish medical tests. *Id*. at ¶12, 14-18, 21.

On the other hand, N.V. has enjoyed an excellent recovery from her GBS after a relatively short treatment course. By three months after her vaccination, her pediatrician noted "dramatic improvement in balance, gait, and endurance." Ex. 12 at 5. By four months after her vaccination, on May 29, 2018, her neurologist declared her "successfully recovered from the illness" with only some residual emotional and physical effects that were expected to improve over time. Ex. 4 at 7-9.  At that time, N.V. had been discharged from physical therapy having met all of her treatment goals. Ex. 6 at 4. Petitioner did not seek any treatment for N.V. for seven more months – after which N.V. consistently had normal neurological exams and no restrictions on activities. *See* Ex. 4 at 5; Ex. 12 at 58. Although Petitioner noted some ongoing sequela at N.V.'s annual wellness exams, N.V. did not receive any additional treatment or evaluation until June 2022, when she was determined not to need significant additional treatment. *See* Ex. 22 at 6; Ex. 23 at 4.

Accordingly, balancing the severity of N.V.'s GBS injury and the impact on her personally against her demonstrably excellent recovery, and considering the arguments presented by both parties, a review of the cited cases, and based on the record as a whole, I find that **$185,000.00 in compensation for actual/past pain and suffering** is reasonable and appropriate in this case. This figure exceeds Petitioner's comparables, and thus takes into account N.V.'s specific circumstances – but is also slightly lower than

Petitioner's demand, since I give some weight to N.V.'s post-vaccination recovered health and prognosis.

### VI.     Award for Future Medical Expenses

Future unreimbursed expenses may be paid when they are "reasonably projected to be incurred in the future." Section 15(a)(1)(A)(iii)(II); *Goldman v. Sec'y of Health & Human Servs.*, No. 16-1523V, 2020 WL 6955394, at *10 (Fed. Cl. Spec. Mstr. Nov. 2, 2020). Future unreimbursed expenses should be awarded to a degree "beyond that which is required to meet the basic needs of the injured person ... but short of that which may be required to optimize the injured person's quality of life." *Scheinfeld v. Sec'y of Health & Human Servs.*, No. 90-212V, 1991 WL 94360 at *2 (Cl. Ct. Spec. Mstr. May 20, 2991).

As noted, both parties retained life care planners to support their positions regarding the appropriate amount of future medical expenses awarded to N.V. *See* Exs. 18, 20, A, and B. Petitioner requests an annuity to fund future medical care for N.V., including periodic neurology and physical therapy evaluations, regular massage and chiropractic treatment, behavioral counseling, health club membership, and adaptive and mobility equipment, beginning when N.V. reaches adulthood and continuing throughout her life.[4] *See* Ex. 18, Mot. at 32-33. Petitioner argues that the requested items have been endorsed by N.V.'s treating pediatrician. Mot. at 33; Ex. 18.

Respondent's life care planner evaluated the recommended items and interviewed N.V. and her parents. *See* Resp. Ex. A-B. Respondent agrees that certain items are reasonable and necessary, including annual follow-up evaluations at Gillette Children's Specialty Healthcare through age 12; behavioral counseling for one year each at age 16, 18, and 21; and custom foot orthotics. Resp. Ex. B. With respect to the remaining items requested by Petitioner, Respondent argues that there are no medical recommendations for such treatment or equipment and no evidence that N.V.'s GBS is "progressive." *Id*. And even the agreed-upon items would be covered by N.V.'s medical insurance, with no out-of-pocket expense – and hence no annuity at all is required. *Id*.

It can be difficult to determine what is "reasonably necessary" in any case, but that difficulty is compounded when dealing with a minor who has been injured, as here. However, N.V.'s medical records reveal a very nearly full recovery. N.V.'s neurological exams have been normal for more than three years, since 14 months after her vaccination. *See* Ex. 4 at 5. Further, since her recovery from GBS, N.V. has not had any restrictions on her activities: she attends a regular school without accommodations, does

---

[4] Petitioner's life care planner acknowledged that N.V. can be covered by her parent's TriCare insurance through age twenty-six. Ex. 18 at 2, 3.

not take any medications, and regularly participates in extracurricular activities. *See* Ex. 19 at 2; Ex. 21 at 1; Resp. Ex. A at 2-3.

While Petitioner has submitted credible evidence that N.V. continues to suffer from some mild sequela of her GBS injury, including fatigue, occasional pain, and sensory sensitivity, Petitioner described N.V.s ongoing sequela as "manageable, but notable." Ex. 17 at 27. N.V. has not received treatment for her GBS sequela since her initial course of treatment ended. When Petitioner sought evaluation for some ongoing issues recently, no significant treatment was recommended. At most, the record does suggest the *potential* for future treatment, including annual re-evaluations as well as possible physical therapy for endurance, gabapentin for symptoms control, occupational therapy for sensory desensitization, and pain psychology.[5] *See* Ex. 22 at 6-8. But none of this possible treatment is comparable to the scope and length of the expenses requested by Petitioner.

Further, even if certain expenses for future medical care do become necessary, it is likely that all or a majority of the out-of-pocket costs will be covered by a medical insurance plan. Neither party suggests that there are likely to be significant future out-of-pocket expenses through N.V.'s age 26 (in the year 2040) due to her continuing coverage. And Petitioner (who bears the burden of proof on demonstrating the reasonability of any item of damages) has not shown that existing medical insurance coverage is not likely to support N.V. in this way. Therefore, it is unlikely she will experience required care costs for the next 15-plus years that would not be covered, foregoing the need for the Program (which is always the "payor of last resort") to reimburse these otherwise-speculative care costs. *See e.g. Hulon v. Sec'y of Health & Human Servs.*, No. 19-1985V, 2022 WL 2069141, at *1 (Fed. Cl. Spec. Mstr. May 3, 2022).

I conclude the same for the period thereafter. Petitioner's life care planner notes that "it is more than likely that N.V. will be able to secure a full-time job with benefits." Ex. 18 at 2. And a full review of the record indicates that more distant future medical expenses are simply too speculative to award in this case. While N.V. continues to experience mild ongoing sequela from her GBS injury (as many GBS petitioners do), those sequela do not render her disabled or prevent her from fully living her life. In fact, there is preponderant evidence of the opposite – with N.V. currently attending regular school with no accommodations, "keeping up with her peers during physical activity," and participating in extracurricular activities on a regular basis. Ex. 19 at 1. And there is not preponderant evidence in the record suggesting that N.V.'s GBS is likely to recur or that her current sequela are likely to worsen over time.  As such, the medical services and

---

[5] An October 2022 occupational evaluation suggested that N.V.'s symptoms could be managed with "general strategies" and did not require ongoing occupational therapy treatment. Ex. 23 at 7.

equipment requested by Petitioner throughout N.V.'s lifetime as not "reasonably projected to be incurred in the future." *See* Section 15(a)(1)(A)(iii)(II).

Therefore, requested future medical expenses and annuity are denied.

## Conclusion

For all of the above reasons, the I award **Petitioner a lump sum payment of $185,000.00 in the form of a check payable to Petitioner Sarah Voeller, on behalf of her minor child, N.V.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of Court is directed to enter judgment in accordance with this Decision.[6]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[6] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.